**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
Danville Division

| | | |
|---|---|---|
| **JAMAR DAVIS,** | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 4:13-cv-00035 |
| v. | ) | |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| Acting Commissioner, | ) | |
| Social Security Administration, | ) | By:    Joel C. Hoppe |
| Defendant. | ) | United States Magistrate Judge |

## REPORT AND RECOMMENDATION

Plaintiff Jamar Davis asks this Court to review the Commissioner of Social Security's ("Commissioner") final decision denying his applications for child's insurance benefits ("CIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401–434, 1381–1383f. Davis argues that the Administrative Law Judge ("ALJ") should have given greater weight to an examining physician's medical opinion, did not fully consider Davis's mental limitations, and should have consulted a vocational expert regarding Davis's ability to work rather than relying on the Medical-Vocational Guidelines ("the grids") to direct a finding of "not disabled." (*See generally* Pl. Br. 13–21.) He urges the Court to reverse the Commissioner's decision and to award benefits, or to remand his case for further administrative proceedings. (*See* Pl. Br. 22.)

This Court has authority to decide Davis's case under 42 U.S.C. §§ 405(g) and 1383(c)(3), and his case is before me by referral under 28 U.S.C. § 636(b)(1)(B) (ECF No. 16). After reviewing the administrative record, the parties' briefs, and the applicable law, I find that the Commissioner's final decision is not supported by substantial evidence in the record. First, the ALJ's finding that Davis is "limited to simple and unskilled work" does not reflect the total

Case 4:13-cv-00035-JLK-JCH   Document 19   Filed 07/14/14   Page 1 of 27   Pageid#: 427

limiting effects of Davis's mental impairment. Second, the ALJ did not expressly consider the extent, if any, to which Davis's specific cognitive limitations eroded the unskilled occupational base. These are reversible errors. Therefore, I **RECOMMEND** that the District Court **GRANT** Davis's Motion for Summary Judgment (ECF No. 12), **DENY** the Commissioner's Motion for Summary Judgment (ECF No. 17), **REVERSE** the Commissioner's final decision, and **REMAND** this case for further proceedings under the fourth sentence of 42 U.S.C. § 405(g).

## I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court asks only whether the ALJ applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence," *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951). Ultimately, this Court must affirm the ALJ's factual findings if "'conflicting evidence allows reasonable minds to differ as to whether a claimant is

disabled.'" *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (internal quotation marks omitted)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the applicant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work.[1] *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see also Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983). The applicant bears the burden of proof at steps one through four. *Hancock*, 667 F.3d at 472. At step five, the burden shifts to the Commissioner to prove that the applicant is not disabled. *See id.*

## II. Procedural History

Davis filed for SSI on October 25, 2010, and for CIB on November 16, 2010, alleging disability beginning October 3, 2009. (*See* R. 52, 60.) Davis, who graduated from Halifax County High School with a "Modified Standard" diploma in May 2008, was 19 years old on his alleged onset date and had never worked. (R. 52, 200–07.) He said that he could not work

---

[1] CIB claims are analyzed using the same five-step sequential process. *Hicks v. Colvin*, No. 7:12-cv-618, 2014 WL 670916, at *2 n.2 (W.D. Va. Feb. 20, 2014); Soc. Sec. R. 11-2p, 2011 WL 4055665, at *2–3 (Sept. 12, 2011) ("Evaluating Disability in Young Adults"). However, a dependant adult applicant for CIB also must show that his or her disability began before his or her 22nd birthday. *See* 20 C.F.R. § 404.350(a)(2), (5).

because of "achondroplasia, leg problems, sleep apnea, and asthma." (R. 52.) A state agency twice denied his applications in 2011. (R. 59, 67, 81, 93.)

Davis appeared with counsel at an administrative hearing on June 6, 2012. (R. 12.) He testified as to his symptoms and to the limiting effect of his conditions. (R. 22–43.) No one else testified at Davis's hearing. (*See* R. 26.) In a written decision dated June 27, 2012, the ALJ concluded that, based on his age, education, and ability to do "unskilled light work," Davis was not entitled to disability benefits. (R. 19–20.)

The ALJ first found that Davis had not yet turned 22 years old on his alleged disability-onset date. (R. 14.) He found that Davis suffered from "severe" hypochondroplasia,[2] borderline intellectual functioning, sleep apnea, and asthma. (*Id.*) None of Davis's severe impairments or combination of impairments met or medically equaled one of the adult impairments listed in the Act's regulations. (*See id.* (citing 20 C.F.R. pt. 404, subpt. P, app. 1, pt. A §§ 3.10, 12.05).)

The ALJ next determined that Davis had the residual functional capacity ("RFC")[3] to do "simple and unskilled" light work that involved only occasional climbing, crawling, and kneeling and avoided "concentrated exposure to fumes and odors." (R. 16.)

At Step Four, the ALJ found that Davis had never worked and therefore could not return to a past job or occupation. (*See* R. 19.) At Step Five, the ALJ used grid Rule 202.20 as a

---

[2] Hypochondroplasia is a type of dwarfism characterized by short stature, a long trunk and short limbs, broad and short fingers, and a normal-appearing face. *Dorland's Illustrated Medical Dictionary* 913 (31st ed. 2007). Individuals with hypochondroplasia exhibit "milder clinical features" than individuals with achondroplasia. *Id.* The latter condition is characterized by "dwarfism with short limbs, normal trunk, small face, normal vault, lordosis, and trident hand[s]." *Id.* 15.

[3] Residual functional capacity, or "RFC," is an applicant's *maximum* ability to work "on a regular and continuing basis" despite his or her limitations. Soc. Sec. Ruling 96-8p, 1996 WL 374184, at *1 (Jul. 2, 1996). The RFC takes into account "all of the relevant medical and other evidence" in the applicant's record, 20 C.F.R. §§ 404.1545(a), 416.945(a), and reflects the "total limiting effects" of the person's impairments and related symptoms, *id.* §§ 404.1545(e), 416.945(e); *see also* Soc. Sec. R. 85-15, 1985 WL 56857, at *6 (Jan. 1, 1985) ("Any impairment-related limitations created by an individual's response to demands of work . . . must be reflected in the RFC assessment.").

"framework" for finding Davis "not disabled" because Davis's "additional limitations [had] little or no effect on the occupational base of unskilled light work." (*Id.*) The Appeals Council declined to review the ALJ's decision on June 25, 2013 (R. 1), and this appeal followed.

## III. Discussion

Davis makes three arguments on appeal. First, he argues that the ALJ should have fully adopted the opinion of consultative examiner Dr. Glen Monteiro, M.D., regarding Davis's physical limitations. (Pl. Br. 13.) Second, Davis argues that the ALJ did not fully incorporate Davis's mental limitations into his final RFC. (Pl. Br. 17.) Third, he argues that the ALJ should have consulted a vocational expert ("VE") about Davis's ability to work rather than relying on the grids to direct a finding of "not disabled." (Pl. Br. 19.)

A.      *Davis's Physical Capabilities*

Agency regulations instruct ALJs to weigh each medical opinion[4] in the record. 20 C.F.R. §§ 404.1527(c), 416.927(c). The regulations classify medical opinions by their source: those from treating sources and those from non-treating sources. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c). Opinions from non-treating sources are not entitled to any particular weight. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c). Rather, the ALJ must consider certain factors in determining what weight to give such opinions, including the source's familiarity with the applicant; the weight of the evidence supporting the opinion; the source's medical specialty; and the opinion's consistency with other relevant evidence in the record. *See id.* Opinions from examining physicians generally are entitled to greater weight than opinions from non-examining physicians, such as state-agency medical reviewers. *Radford v. Colvin*, 734 F.3d 288, 296 (4th Cir. 2013).

---

[4] "Medical opinions are statements from . . . acceptable medical sources that reflect judgments about the nature and severity of [the applicant's] impairment(s)," including the applicant's symptoms, diagnosis, and prognosis; what the applicant can still do despite his or her impairment(s); and the applicant's physical or mental restrictions. 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).

5

Ultimately, though, "the ALJ must consider the opinions received in light of the evidence of record and the ALJ must determine whether the record supports the opinions offered." *Stonestreet v. Astrue*, 5:12-cv-111, 2014 WL 992098, at *5 (W.D. Va. Mar. 14, 2014).

If the ALJ's final RFC conflicts with a medical-source opinion, he also must explain why that opinion was not adopted in full. *Young v. Colvin*, 7:12-cv-468, 2014 WL 991712, at *3 (W.D. Va. Mar. 13, 2014) (citing Soc. Sec. R. 96-8p, 1996 WL 374184, at *7 (Jul. 2, 1996)). His "decision 'must be sufficiently specific to make clear to any subsequent reviewers the weight [he] gave' to the opinion and 'the reasons for that weight.'" *Id.* (quoting Soc. Sec. R. 96-2p, 1996 WL 374188, at *5 (Jul. 2, 1996)). As always, the ALJ's choice between conflicting evidence must be supported by substantial evidence in the record. *See Johnson*, 434 F.3d at 656.

### 1. *Dr. Monteiro's Opinion*

The agency arranged for Dr. Monteiro to examine Davis because the medical evidence in Davis's record was insufficient to support a decision on his claim. (R. 54.) At the examination on May 21, 2011, Davis told Dr. Monteiro that he was born with hypochondroplasia and that he suffered "midline lower back pain" after undergoing a procedure "to correct the bilateral bowing of his knees" when he was eight or nine years old. (R. 335.) He said that the pain was particularly bad "after walking more than a mile." (*Id.*) Davis also said that he suffered "bilateral knee pain . . . with occasional numbness and tingling going towards his back from his knees." (*Id.*) Although he did not use an assistive device to walk, Davis said that he "occasionally" felt unsteady on his feet. (*Id.*)

On exam, Dr. Monteiro observed that Davis's "short stature [was] immediately apparent"—the 21-year-old man stood just 4'1½" tall.[5] (R. 337.) Davis exhibited "mild bowing"

---

[5] According to the transcript of Dr. Monteiro's teledictated report (R. 335, 339), Dr. Monteiro also recorded Davis's weight at 252 pounds (R. 337). At 4'1½" tall and 252 pounds, Davis's Body Mass Index

and reduced range of motion in both knees. His lower and upper extremity strength "appeared to be good" at 4/5, and he had normal range of motion in his ankles. (R. 338.) Davis walked with a "slight limp" favoring his left leg. (*Id.*) He had "normal" range of motion in the left hip but experienced pain in the right hip and groin on internal rotation and abduction. (R. 337.)

Based on his physical exam, Dr. Monteiro opined that Davis could sit for six hours, stand and walk for six hours, and walk for four to six hours in an eight-hour workday. (R. 339.) He based those restrictions on Davis's "chronic bilateral leg problems and his hyperchondroplasia [*sic*] status." (*Id.*) Dr. Monteiro also opined that Davis could lift and carry "5 pounds occasionally and less than 2 pounds frequently." (*Id.*) He based that restriction on Davis's "chronic bilateral leg problems which alter body mechanics and make carrying and handling objects difficult[]." (*Id.*) Dr. Monteiro noted that Davis "should have some limitations on bending, stooping, and crouching given his chronic back and knee problems," but he did not specify the extent to which Davis could do these things. (*Id.*) He also said that Davis "may consider" using a single-point cane or a walker to help him ambulate "during acute flare up[s] of the leg pain." (*Id.*)

---

("BMI") would have been approximately 73.8. *See Tool: BMI Calculator*, Mayo Clinic, http://www.mayoclinic.org/bmi-calculator/itt-20084938 (last visited July 6, 2014). Individuals with BMI over 40 are considered morbidly obese. *See Dorland's Illustrated Medical Dictionary* 1329 (31st ed. 2007). Morbid obesity is "severe enough to endanger" the person's health "and is often associated with serious or even life-threatening disorders such as diabetes mellitus, atherosclerosis, [or] hypertension." *Id.* There is no evidence in the record that Davis suffered from any weight-related disorders or limitations. Medical records document Davis's heaviest weight at 173 lbs in April 2010. (R. 327; *see also* R. 33 (150 lbs), 305 (157 lbs), 313 (168 lbs), 314 (161½ lbs).) An examining physician noted that Davis was "obese," but that his posture and gait were still "normal" despite his extra weight at that time. (R. 327.) Dr. Monteiro did not comment on Davis's weight in May 2011. (*See generally* R. 335–40.)

2. *State-agency Opinion*

State-agency reviewer Dr. Martin Cader, M.D., reviewed the medical evidence in Davis's record in July 2011. (R. 88–90.) Dr. Cader opined that Davis could do "light work"[6] with additional postural and environmental limitations. (R. 92.) Specifically, Dr. Cader found that Davis could: (1) occasionally lift and carry 20 pounds; (2) frequently lift and carry 10 pounds; and (3) sit, stand, and walk for about six hours in an eight-hour workday; but (4) should "avoid concentrated exposure" to respiratory irritants and poor ventilation. (R. 88–90.) He recommended using grid Rule 202.20 as a framework for finding Davis "not disabled" because his "non-exertional limitations [did] not significantly erode the [light] occupational base." (R. 92.)

3. *Other Relevant Evidence*

The record contains evidence of Davis's physical condition in 2004, 2007, and 2009–2012. (*See* R. 33–43, 207, 209–219, 259, 282, 287–88, 299–300, 305–06, 313, 314, 325–33, 335–39, 342.)  Davis was a "very active" 14-year-old boy in 2004. (R. 286, 287.) Although he wore knee-high metal prostheses on both legs, Davis did not report any physical limitations related to his achondroplasia, stature, or weight in March 2004. (*See id.*) On the contrary, he was a member of his middle school's track team, had regular household chores, and enjoyed mowing the lawn. (*See id.*)

Davis's April 2007 individualized education program ("IEP") noted that his "medical condition" caused "back problems, asthma, and allergies." (R. 259.) Thus, Davis was allowed to

---

[6] "Light work" involves "lifting no more than 20 pounds at a time" but "frequently" lifting or carrying objects weighing up to 10 pounds. 20 C.F.R. §§ 404.1567(b), 416.967(b). Work in this category often requires "a good deal of standing or walking" or "involves sitting most of the time with some pushing and pulling of arm or leg controls." *Id.* A person must be able to do "substantially all of these activities" in order to "be considered capable of performing a full of wide range of light work." *Id.* A person who can perform light work generally can also perform "sedentary" work. *See id.*

8

use the elevator while enrolled at Halifax County High School. (R. 210, 259.) However, at least in April 2007, Davis "refuse[d] . . . to ride the elevator" because he wanted to be treated like his peers. (R. 259.) His teachers were asked to "encourage [him] to ride the elevator" if they noticed tardiness or shortness of breath. (R. 259.)

On November 11, 2009, Davis saw Nurse Marilyn Mann at Volens Family Practice regarding his sleep apnea. (*See* R. 313.) Davis did not report musculoskeletal pain or functional limitations at that time. (*See id.*) Nurse Mann noted that Davis was "mildly obese" at 168 lbs, had "achondroplasia without difficulty," and was "able to get himself on the examining table without help" during this visit. (*Id.*)

Davis established care at the Roberts Fuller Clinic on March 9, 2010. (R. 330.) The treatment notes document that Davis had "metal rod[s] placed in both legs because of dwarfism." (*Id.*) On this visit, Davis reported joint pain in his right hip and lower back. (*Id.*) He denied numbness, decreased range of motion, joint stiffness, or muscle pain and weakness. (*Id.*) On exam, Dr. Broderick D. King, M.D., noted that Davis's posture and gait were "normal." (R. 331.) Both legs had "normal" strength, tone, and range of motion without pain. (R. 332.) Beyond noting Davis's "short limbs," Dr. King did not document any deformities, tenderness, or fractures in Davis's arms and legs. (*Id.*) He said that they would schedule an x-ray of Davis's hip and back, but he did not prescribe any pain medication or recommend a particular course of treatment. (*See id.*)

Davis returned to Dr. King's office on April 21, 2010. (R. 326.) He again complained of pain in his leg and hip, and added without explanation that his "leg [was] moving from under him in the [morning]." (*Id.*) Davis denied numbness, decreased range of motion, joint stiffness, or muscle pain and weakness. (*Id.*) On exam, Dr. King noted that Davis was an "obese and well

9

developed" young man with "normal" posture and gait. (R. 327.) Both legs still had "normal" strength, tone, and range of motion without pain. (R. 328.) Dr. King instructed Davis to return in six months, and noted that they would "consult ortho" if Davis's joint pain did not improve. (*Id.*) He did not prescribe any pain medication or recommend a particular course of treatment. (*See id.*) Davis apparently did not receive any medical care between April 21, 2010, and January 2012. (*See* R. 29, 34.)

Davis's mother, Arlene Barksdale, completed a pain questionnaire and adult function report on Davis's behalf on March 23, 2011. (*See* R. 209–19.) Barksdale wrote that Davis, on a typical day, exercised, played games, and watched television. (R. 212.) He also cleaned his bedroom and "sometimes" tried to mow the grass. (R. 213, 214.) Barksdale said that Davis needed help putting on his socks, getting into and out of the bathtub, washing his back and behind, and using the toilet. (R. 213.) She said that Davis went shopping, attended church and social group, hung out with friends, and was "trying to learn how to drive because of [his] Dwarfism." (R. 215, 216.) However, she later added that Davis "tri[ed] not to take part[] in anything." (R. 216.)

On June 6, 2012, Davis testified that he stood 4'2½" tall and weighed 150 pounds. (R. 33.) Noting the paucity of medical evidence in the record, the ALJ asked Davis if he had "seen any family doctors or [had] any hospital visits since April 2010." (R. 34.) Davis replied only that he went to the emergency department in January 2012 "because [his] leg was bothering [him] real bad." (*Id.*) He never produced records of that visit. (R. 12.) As of June 2012, Davis used a CPAP machine, an albuterol inhaler, an Advair inhaler, and Claritin for his asthma and allergies. (R. 35.) He said that he had not been prescribed any pain medication. (*Id.*)

10

Davis testified that he had not worked since October 2009, but that he had applied for several jobs since that time. (R. 33.) Davis testified that he went shopping with his mother, cooked food in the microwave, played video games on his Xbox, hung out with friends, cleaned his bedroom and vacuumed, and did light yard work. (R. 37–38.) He also did "pushups and stuff" for exercise and played basketball every other Sunday. (R. 39.) Davis said that he could care for himself but needed help getting into and out of the bathtub. (R. 38.)

Davis also described his perceived exertional limitations. (*See* R. 36, 43.) For example, he said that he could lift and carry 10 pounds; sit for 15 to 20 minutes; stand for "probably" 10 to 15 minutes; and walk "[n]ot even a half-a-mile." (R. 36.) He also said that carrying "stuff" on his right shoulder "affects [his] leg." (R. 43.) To Davis's knowledge, none of his healthcare providers had put "any sort of permanent restriction" on his physical activities. (R. 39.) He also denied being "prescribed any sort of assistive device to use on a permanent, daily basis." (R. 36.)

### 4.     The ALJ's Opinion Analysis

The ALJ considered Dr. Monteiro's and Dr. Cader's opinions in determining the physical aspects of Davis's RFC. (*See* R. 18.) He gave Dr. Cader's opinion "great weight" without any analysis or explanation. (*Id.*) The ALJ then summarized Dr. Monteiro's objective findings and opinion that Davis "could stand walk [*sic*] for 6 hours in an 8-hour workday," "walk for 4–6 hours in an 8-hour workday," could "carry 5 pounds occasionally and less than 2 pounds frequently," and had "some limitation in bending, stooping, and crouching." (*Id.*) He gave Dr. Monteiro's assessment "some weight." (*Id.*)

The ALJ gave "no weight" to Dr. Monteiro's "limitations in lifting and carrying" because he found that that they were "not supported by the longitudinal record and [were] inconsistent with [Davis's] reported activities." (*Id.*) He did not identify any specific evidence in the

11

"longitudinal record" that was inconsistent with this portion of Dr. Monteiro's opinion. Earlier in his decision, the ALJ found that Davis "enjoyed playing basketball and hanging out with friends," "use[d] the internet and played video games," attended church "regularly," went grocery shopping with his mother, prepared simple meals, and "cleaned his bedroom and mowed the lawn sometimes." (R. 16–17 (citing R. 37–39, 212–19).)

     *5.    Analysis*

Davis argues that the ALJ "committed legal error in disregarding" Dr. Monteiro's opinion that Davis was "capable of less than sedentary work." (Pl. Br. 13, 14.) He believes that Dr. Monteiro's opinion should have trumped Dr. Cader's opinion because, unlike Dr. Monteiro, Dr. Cader "never ever even saw" him. (Pl. Br. 14; *see also id.* 15–16.) He argues that the ALJ would have reached the same conclusion had he not "failed to consider" the factors listed in 20 C.F.R. §§ 404.1527(c) and 416.927(c). (*Id.*)

I note at the outset that both Dr. Monteiro and Dr. Cader found that Davis could sit and stand for six hours in an eight-hour workday. (*See* R. 88, 339.) Both physicians also opined that Davis could walk for at most six hours in an eight-hour day. (*See id.*) In determining that Davis is capable of light work, the ALJ appears to have adopted the doctors' opinions as to Davis's ability to sit, stand, and walk. (*See* R. 18.) *See Hayes v. Comm'r of Soc. Sec.*, No. 4:08-cv-37, 2009 WL 2843218, at *3, *6 (W.D. Va. Aug. 31, 2009) (Kiser, J.) (affirming ALJ's finding that a person who could "walk for four to six hours with no assistive device but frequent breaks" could perform "light work"). Although Dr. Monteiro suggested that Davis "may consider" using a walking device during acute flare-ups of his leg pain, he did not impose any additional walking or standing restrictions based on this suggestion. (R. 339.)

12

The primary difference between these two doctors' opinions concerns the amount of weight that Davis can lift and carry. (*Compare* R. 339, *with* R. 88.) Dr. Cader—and ultimately the ALJ—found that Davis could carry 20 pounds occasionally and 10 pounds frequently. (R. 88.) Dr. Monteiro found that Davis could carry "5 pounds occasionally and less than 2 pounds frequently." (R. 339.) Dr. Monteiro's restriction would indeed disqualify Davis from all "light" jobs and at least some "sedentary" jobs. *See* 20 C.F.R. § 404.1567(a) ("Sedentary work involves lifting no more than 10 pounds at a time and occasionally carrying [objects] like docket files, ledgers, and small tools.").

The ALJ expressly rejected Dr. Monteiro's "limitations in lifting and carrying" alone because he found that they were "not supported by the longitudinal record and [were] inconsistent with [Davis's] reported activities." (R. 18.) In March 2011 and June 2012, Davis reported doing "pushups and stuff" for exercise, playing basketball every other weekend, playing video games on his Xbox, cleaning and vacuuming his bedroom, and "sometimes" mowing the lawn. (*See* R. 37–39, 215–16; *see also* R. 17.) Davis also testified that he could lift and carry 10 pounds. (R. 35.) The ALJ reasonably concluded that Davis's activities were "inconsistent" with Dr. Monteiro's opinion, offered after one physical exam in May 2011, that Davis could lift and carry at most five pounds. *Cf. Chestnut v. Colvin*, No. 4:13-cv-8, 2014 WL 2967914, at *4 (W.D. Va. Jun. 30, 2014) (Kiser, J.) ("The ALJ may properly discount the opinion of a treating physician when it is inconsistent with a claimant's daily activities.").

The ALJ also noted that Dr. Monteiro's lifting and carrying restriction was unsupported by the longitudinal record. His reasoning on this point lacks specificity, but it is nonetheless accurate. Dr. Monteiro explained that he based his lifting and carrying restriction on Davis's "chronic bilateral leg problems which alter body mechanics and make carrying and handling

13

objects difficult[].” (R. 339.) But treating sources consistently found that Davis had normal strength and range of motion in all extremities and a normal gait, and they did not report functional restrictions. (R. 313–14, 327–28, 331–32.) Dr. Monteiro's physical examination also revealed 4/5 “[s]trength in [Davis's] upper and lower extremities,” which Dr. Monteiro indicated “appeared to be good.” (R. 338.)

I am satisfied that the ALJ did not commit legal error in rejecting this portion of Dr. Monteiro's opinion.[7] *See Harder v. Comm'r of Soc. Sec.*, No. 6:12-cv-69, 2014 WL 534020, at *7 (W.D. Va. Feb. 10, 2014). The ALJ explained why he did not fully adopt Dr. Monteiro's opinion, and his decision is “sufficiently specific to make clear” to this Court the “weight [he] gave to the opinion and the reasons for that weight.” *Young*, 2014 WL 991712, at *3 (internal quotation marks omitted). Furthermore, the ALJ accommodated Davis's hypochondroplasia and related symptoms by limiting him to “light work” with additional postural limitations. (R. 16, 18.) The ALJ reasonably and properly based that decision on Davis's reported daily activities, his “conservative course and inconsistent treatment” of allegedly disabling pain, examining physicians' “mild objective findings,” and opinion evidence from examining and state-agency physicians. (R. 18.) Substantial evidence supports the ALJ's reasons for rejecting Dr. Monteiro's weight restriction, as well as the ALJ's decision that Davis can still perform “light work” as that term is defined in the regulations.

---

[7] The ALJ erred when he gave Dr. Cader's opinion “great weight” (R. 18) without indicating why the opinion deserved that weight. *Radford*, 734 F.3d at 295. However, the ALJ's reasons for discrediting Dr. Monteiro's lifting and carrying restriction—Davis's activities of daily living and the longitudinal record, which includes findings of good strength in the upper and lower extremities and contains no lifting restrictions from treating physicians—provide support for Dr. Cader's assessment. Moreover, except for the lifting and carrying restriction, Dr. Monteiro's opinion was substantially similar to Dr. Cader's. An ALJ may rely upon the opinion of a non-examining physician “when it is consistent with the record.” *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984). Accordingly, I find it “inconceivable that a different administrative conclusion would have been reached absent the error.” *Kersey v. Astrue*, 614 F. Supp. 2d 679, 696 (W.D. Va. 2009) (defining the harmless-error standard in social security disability cases).

B.    *Davis's Mental Capabilities*

Davis next argues that the ALJ did not "fully" accommodate the mental limitations documented in his school records and in the consultative evaluation of Dr. Chris Cousins, Ph.D. (Pl. Br. 18.) He argues that this evidence proves that he is "illiterate," incapable of "maintaining a mainstream schedule or pace or ability," and "cannot manage the routine or requirements of school or work without extraordinary accommodations." (Pl. Br. 18, 19.) Davis objects that the ALJ did not "truly consider[]" these mental limitations when formulating his RFC. (Pl. Br. 18.)

1.    *Dr. Cousins's Opinion*

On August 16, 2011, Dr. Cousins evaluated Davis at the request of the agency by interviewing him and administering the Wechsler Adult Intelligence Scale–Fourth Edition ("WAIS-IV"). (R. 341.) Dr. Cousins observed that Davis greeted him warmly and appropriately, answered his questions clearly and spontaneously, and was engaged and cooperative during their interview. (R. 341.) Davis also exhibited "good" eye contact, "was very pleasant[,] and had a friendly demeanor" throughout. (*Id.*)

Davis's performance on the WAIS-IV—demonstrating a Full Scale IQ of 72—"place[d] his intellectual functioning in the borderline range." (R. 345–46.) Davis "showed relative strength," albeit still in the "low average range," in the Perceptual Reasoning Index, "which assesses an individual's ability to analyze and synthesize abstract visual stimuli." (R. 345.) Davis showed relative weakness in the Working Memory Index, Verbal Comprehension Index, and Processing Speed Index. (*See id.*) Dr. Cousins explained that Davis appeared to have "good" abstract-thinking ability, "fair to good" capacity for immediate and remote memory, "fair to good" judgment and commonsense reasoning ability, "fair at best" calculation ability, and "poor" knowledge of commonly known facts and current events. (R. 344.)

15

Based on the interview and WAIS-IV results, Dr. Cousins opined that Davis "appear[ed] capable of performing simple and repetitive tasks," but that he "would not be able to perform detailed and complex tasks." (R. 346.) Dr. Cousins thought that Davis's "intellectual impairment" would cause "no worse than moderate difficulty" in "completing a normal workday or workweek without interruption and performing work activities on a consistent basis." (*Id.*) He also opined that, "due to his level of intellectual impairment," Davis "would require some special instructions or additional supervision." (*Id.*) Given Davis's "friendly" demeanor, Dr. Cousins opined that Davis "would be able to accept instructions from a supervisor and interact with co-workers and the public." However, he cautioned that Davis "may have some difficulty dealing with the usual stresses encountered in competitive work." (*Id.*)

2. *Other Relevant Evidence*

For most of his academic career, Davis received special-education services in a regular public school "under the label of Specific Learning Disability." (R. 289, 292.) Psychoeducational tests conducted in 1998 revealed "average to high average cognitive skills" in verbal reasoning, abstract and visual reasoning, quantitative reasoning, and short-term memory. (R. 290.) Davis scored "within the average range for his age" on reading, spelling, and arithmetic tests. (*Id.*) Those results were considered "inconsistent" with testing conducted in 1995, "which indicated [Davis's] cognitive ability to be within the low average range for his age." (*Id.*)

Davis was reevaluated for special-education services before going to middle school in 2001. (*See* R. 289.) At that time, Davis's Full Scale IQ was 73, and his "cognitive scores consistently fell within the borderline range" for his age. (R. 292, 294.) Davis showed relative weakness in verbal reasoning and processing speed, where his "performance [fell] within the low average range for his age." (*Id.*) Dr. Reneé Sexton, Ed.S., the school psychologist who

16

reevaluated Davis, recommended that special-education services continue in middle school. (R. 293.) She encouraged "mainstreaming" Davis with the caveat that he "would require a great deal of accommodations in the regular education program in order . . . to be successful." (*Id.*)

The record contains IEPs from Davis's junior and senior years (2007–2008) at Halifax County High School. (R. 252–84.) Davis's IEP team concluded that he did not "demonstrate[] significant cognitive disabilities" and did not "require[] intensive, frequent, and individualized instruction" that might have justified a more "restrictive" learning environment. (R. 275; *see also* R. 268–69.) Rather, Davis could receive a regular public-school education with some special-education services and specific accommodations for a processing disorder that affected his reading comprehension, memory, and timed output. (*See* R. 259, 266.)

During the 2007–08 school year, for example, Davis received copies of his teachers' daily notes, had extra time to finish in-class written assignments, received shortened assignments "as deemed necessary," was graded on a separate curve, and could ask teachers to read tests aloud. (R. 259, 266.) His teachers were asked to "question[ Davis] for comprehension" whenever they presented new material. (R. 266.) Davis could also keep a set of textbooks at home, and his teachers were generally required to check-in with his mother every two weeks. (*Id.*)

The 2007 IEP team expressed concern that Davis had "become forgetful in fulfilling his academic responsibility," had "not utilized" his accommodations to their "fullest extent," and had not "worked to his full potential" in the past. (R. 259.) Davis's classroom teachers observed that he was "too relaxed" in class and "extremely slow, almost to the point of being negligent[,] in completing assignments." (*Id.*) Davis's final IEP, however, notes that he "made wise use of his time" in 2007–08. (R. 254.) "With a reminder, [Davis] normally [got] back on track and progress[ed]" toward his goals. (R. 253.)

17

According to his high-school transcript, Davis took at least four courses each semester and never missed more than five classes per year. (R. 251.) Davis earned mostly B's and C's in core subjects like English, math, history, and science. (*See id.*) Davis did not have to repeat any grades, but he did retake one English course in summer school. (*See id.*) Davis graduated with a Modified Standard Diploma on May 30, 2008. (*See id.*)

On August 19, 2011, Dr. Leslie Montgomery, Ph.D., reviewed Davis's file for the state agency. (*See* R. 87, 90–91.) Based on Davis's school records and Dr. Cousins's report, Dr. Montgomery opined that Davis's "borderline intellectual functioning" was not presumptively disabling (R. 86, 87), but that it would cause many "moderate" limitations in the competitive workplace (R. 90–91). For example, Dr. Montgomery opined that Davis would be "moderately limited" in his ability to follow "very short and simple instructions"; to "maintain attention and concentration for extended periods"; to "perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances"; to "sustain an ordinary routine without special supervision"; to complete a normal work schedule without interruptions; and to "perform at a consistent pace" without unreasonable breaks. (R. 90–91.) She also opined that Davis would be "markedly limited" in his ability to follow "detailed" instructions and "would not be able to perform detailed and complex tasks." (R. 90.) Like Dr. Cousins, Dr. Montgomery attributed these work-related limitations to Davis's borderline intellectual functioning. (*See* R. 90–91.)

On June 6, 2012, Davis testified that he had tried to enroll in community college, but he "didn't have the money for . . . the school." (R. 32.) He said that he was "trying to enroll in National College this year" and still "want[ed] to do electronics." (*Id.*) Davis told the ALJ that he knew how to write and used the computer to "search up things sometimes . . . and [for] emailing

and stuff like that." (R. 36, 37.) Davis said that he completed special-education English courses for "reading [because] some things [he] can't like comprehend." (*Id.*) He also said that he twice failed the drivers' license test because he "couldn't really comprehend with it." (*Id.*)

    *3.    The ALJ's Written Opinion*

    The ALJ considered Davis's intellectual functioning at two points in his decision. (*See* R. 15–16, 17.) First, he compared Davis's cognitive ability to the criteria for a presumptively disabling intellectual disability under the listings. (R. 15.) The term "intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested" before a person's 22nd birthday. 20 C.F.R. pt. 404. subpt. P, app. 1, pt. A § 12.05. The ALJ found that Davis did not meet the criteria under Listing 12.05 because his Full Scale IQ was at least 72 and he had only "moderate difficulty" (*i.e.*, less than "marked") maintaining concentration, persistence, or pace. (R. 15.)

    Second, in determining the mental aspects of Davis's RFC, the ALJ observed that the record "reflect[ed] some inconsistent test scores, [with] cognitive [function] ranging from borderline to high average." (R. 17.) However, he acknowledged Dr. Cousins's recent diagnosis of "Borderline Intellectual Functioning" based on Davis's Full Scale IQ of 72. (R. 18.) The ALJ also considered school records indicating that Davis had an IEP, received educational services through the "specific learning disabled program," and had a documented "processing deficit in verbal reasoning [that] impact[ed] reading comprehension, spelling, and math." (R. 17.) The ALJ did not discuss the specific accommodations that Davis received in high school. (*See id.*)

    The ALJ gave "great weight" to Dr. Montgomery's mental functional-capacity assessment without any explanation or analysis. (R. 18.) He also gave "great weight" to Dr. Cousins's opinion because he found it "consistent with the longitudinal record, including school

19

records and [Davis's] IEP." (*Id.*) The ALJ noted Dr. Cousins's specific finding that Davis's Full

Scale IQ of 72 placed him in the "borderline intellectual functioning" range. (R. 18.) The ALJ

summarized Dr. Cousins's opinion as follows:

> [Davis] was capable of performing simple and repetitive tasks, maintain[ing] regular attendance, would have no more than a moderate difficulty in completing a normal workday or workweek without interruptions or performing work activities on a consistent basis[,] . . . [was] able to accept instructions from supervisors and [could] interact with co-workers and the public.

(R. 18.)

Ultimately, the ALJ found that Davis was "limited to simple and unskilled work, but his

remaining mental capacities [were] sufficient to meet the intellectual and emotional demands of

unskilled, competitive, remunerative work on a sustained basis." (*Id.*) Specifically, the ALJ

found that Davis could: (1) understand, remember, and carry out "simple instructions"; (2) make

"simple work-related decisions"; (3) respond appropriately to supervision, co-workers and "usual

work situations"; and (4) deal with changes in a routine work setting. (R. 16.) Earlier in his

decision, the ALJ also found that Davis had "moderate difficulty" maintaining concentration,

persistence, or pace. (R. 15.)

> 4.    *Analysis*

Davis argues that the ALJ did not consider evidence in his school records that proves he

is "illiterate" and incapable of managing the "requirements of school or work without

extraordinary accommodations." (Pl. Br. 18, 19.) The ALJ's discussion of those records is slim,

but it is adequate to demonstrate that he "considered" the evidence therein. *See Reid v. Comm'r

of Soc. Sec.*, --- F.App'x ---, 2014 WL 2958800, at *4 (4th Cir. Jul. 2, 2014). He indicated that he

considered Davis's school records and IEP, noted the results of various psychoeducational tests,

and described Davis's specific cognitive limitations. (*See* R. 17–18.) The ALJ also discussed Dr.

20

Cousins's report, in which he reviewed Davis's psychoeducational test results from 1995, 1998, and 2001. (*See* R. 18, 342.) I am satisfied ALJ considered Davis's school records and the evidence of his cognitive limitations contained therein. Furthermore, I find no opinion in the record that supports Davis's contention that he was "illiterate." Evidence to the contrary shows that he graduated from high school, albeit with a modified diploma.

In assessing Davis's mental limitations, the ALJ gave "great weight" to Dr. Cousins's opinion because it was "consistent with the longitudinal record, including school records and [Davis's] IEP." (R. 18.) The ALJ also gave "great weight" to Dr. Montgomery's mental functional-capacity assessment. (R. 18.)

Consistent with the opinions of Drs. Cousins and Montgomery, the ALJ limited Davis to "simple and unskilled work." The record supports this portion of the RFC that addresses the type of tasks Davis can perform. Unskilled work "is a term of art, defined by regulation as 'work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.'" *Fisher v. Barnhart*, 181 F.App'x 359, 364 n.3 (4th Cir. 2006) (quoting 20 C.F.R. § 404.1568(a)).

The ALJ did not, however, adopt any additional limitations that the doctors had found, but rather determined that Davis's "remaining mental capacities are sufficient to meet the intellectual and emotional demands of unskilled, competitive, remunerative work on a sustained basis." (R. 16.) "[C]ompetitive, remunerative, unskilled work" demands the ability, on a sustained basis, "to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." Soc. Sec. R. 85-15, 1985 WL 56857, at *4 (Jan. 1, 1985). The ALJ did not explain why he did not adopt the additional limitations cited by these doctors to whose opinions

21

he had given "great weight," and his omission of these further limitations from the RFC is inconsistent with other findings in his written opinion.

In his listings analysis, the ALJ found that Davis had moderate difficulty in concentration, persistence, or pace – a finding consistent with the opinions of Drs. Montgomery and Cousins. Additionally, both doctors opined that Davis would require special supervision or instructions. (R. 91, 346.) His school records support this limitation, but the ALJ did not account for this limitation or explain why he did not. Both doctors also opined that Davis would have moderate difficulty completing a normal workday or workweek without interruption and completing work activities on a consistent basis. (R. 91, 346.) Again, the ALJ did not account for this limitation or provide an explanation for its omission from the RFC.

It is possible that the ALJ "limited [Davis] to simple types of jobs *because* he experiences moderate impairment in concentration, persistence or pace." *Sexton v. Colvin*, --- F. Supp. 2d ---, 2014 WL 2090647, at *3 (W.D. Va. May 19, 2014). That rationale seems to suggest that "anyone with moderate impairments in concentration, persistence, or pace can perform simple jobs." *Id.* A restriction to simple unskilled work, however, is not so all-encompassing. In *Sexton*, Chief District Judge Glen E. Conrad found that "[a] limitation to simple, unskilled work does not necessarily" accommodate a person's difficulty in concentrating on or persisting in a task or maintaining the pace required to complete a task. *Id.* at *4 (citing *Wiederholt v. Barnhart*, 121 F.App'x 833, 839 (10th Cir. 2005)) (other citations omitted). Furthermore, a restriction to simple unskilled work does not address a limitation that Davis requires additional supervision and instruction or provide an accommodation to enable him to complete a normal workweek or work activities. Accordingly, I find that the RFC limiting Davis to "simple and unskilled" work, without incorporating the specific mental limitations identified by the ALJ, Dr. Cousins, and Dr.

Montgomery, or explaining why those limitations do not apply, is not supported by substantial evidence in the record.

C.     *Reliance on the Grids*

Finally, Davis argues that the ALJ should have consulted a vocational expert ("VE") regarding his ability to perform work that exists in the national economy rather than relying on the grids to direct a finding of "not disabled." (Pl. Br. 19.) Davis has no "past relevant work," and the Commissioner bears the burden of proving that he can perform work that exists in the national economy. 20 C.F.R. § 404.1520(g)(1); *see also Hancock*, 667 F.3d at 472 (noting that the Commissioner bears the burden at Step Five). The Commissioner can meet that burden by calling a VE to testify, 20 C.F.R. § 404.1566(e), or, in "appropriate cases," by relying on the grids to direct a finding of "not disabled," *Heckler v. Campbell*, 461 U.S. 458, 470 (1983).

The grids are published tables that take administrative notice of the number of unskilled jobs at each exertional level in the national economy. 20 C.F.R. pt. 404, subpt. P, app. 2 § 200.00(a). The grids consider only the exertional, or strength, component of the applicant's RFC. *See Walker v. Bowen*, 889 F.2d 47, 49 (4th Cir. 1989). They do not take into account mental, postural, or environmental limitations. *See id.* Thus, the Commissioner generally cannot rely on the grids alone when the applicant "suffers from both exertional and nonexertional limitations" that affect his or her RFC "to perform work of which he [or she] is exertionally capable." *Id.* In those cases, the Commissioner must consult a VE to prove that the applicant can perform specific jobs that exist in the national economy. *See id.*

That said, "not every malady of a nonexertional nature rises to the level of a nonexertional impairment." *Smith v. Schweiker*, 719 F.2d 723, 725 (4th Cir. 1984) (internal quotation marks omitted). Thus, the Commissioner may rely on the grids alone if the person's

mental, postural, or environmental limitation(s) does not "affect" his ability to perform the full range of unskilled work of which he or she is physically capable. *See id.* Whether a condition "affects" the person's ability to perform such work is a question of fact that this Court reviews under the substantial evidence standard. *See id.*; *see also Stonestreet*, 2014 WL 992098, at *9.

The ALJ in this case found that Davis could perform "simple and unskilled" light work that involved only "occasional" climbing, crawling, and kneeling and avoided "concentrated exposure to fumes and odors." (R. 16.) At Step Five, the ALJ found that Rule 202.20[8] would direct a finding of "not disabled":

> If the claimant had the residual functional capacity to perform the full range of light work . . . . However, the additional limitations have little or no effect on the occupational base of unskilled light work. A finding of 'not disabled' is therefore appropriate under the framework of this rule.

(R. 19.) The ALJ explained that "some limitations" in climbing, kneeling, and crawling "do not have a significant impact on the broad world of work." (*Id.* (citing Soc. Sec. R. 85-15).) He did not mention Davis's mental limitations or explain the extent, if any, to which they eroded the unskilled occupational base.

This omission constitutes reversible error. *See Hancock v. Barnhart*, 206 F. Supp. 2d 757, 767 (W.D. Va. 2002) (Kiser, J.) (ordering sentence-four remand because "the ALJ should have determined the erosion of occupational base due to [the applicant's] specific limitation before making a final ruling"). The ALJ has a duty to "make requisite findings [and] to articulate the bases for his conclusions." *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983).

---

[8] Rule 202.20 directs a finding of "not disabled" when the applicant: (1) is a "younger" individual; (2) who graduated high school; (3) has no past work experience; and (4) can physically "perform a wide or full range of light work." 20 C.F.R. pt. 404, subpt P, app. 2 §§ 202.20, 202.00(a)–(b). According to the grids, there are "[a]pproximately 1,600 separate sedentary and light unskilled occupations" available to a person who fits that profile. *Id.* § 202.00(a).

As discussed above, the ALJ in this case gave "great weight" to medical-opinion evidence that Davis can perform only simple and repetitive tasks, is moderately limited in his ability to sustain an ordinary routine without special supervision, and has moderate difficulty completing a normal workday or workweek without interruption and performing work activities on a consistent basis. (R. 18, 90–91, 346.) He also specifically found that Davis had "moderate difficulty" maintaining concentration, persistence, or pace. (R. 15.)

Any of those limitations could "affect" the unskilled light occupational base. *See, e.g.*, *Sexton*, 2014 WL 2090647, at *3; *Chestnut*, 2014 WL 2967914, at *4 (questioning whether a person who is limited to "simple, routine tasks" and "simple instructions" could perform a full range of "unskilled" work). Indeed, even a "less than substantial loss of ability to perform . . . basic [mental] work activities" could erode the unskilled occupational base. Soc. Sec. R. 96-9p, 1996 WL 374185, at *9 (Jul. 2, 1996). Thus, whenever a person "has been found to have a limited ability in one or more of these basic work activities," his "remaining capacities must be assessed and a judgment made as to their effects on the unskilled occupational base." *Id.* Remand is therefore necessary to "give both parties, the ALJ, and if necessary, a vocational expert, the opportunity to resolve squarely whether" Davis's mental impairments erode the occupational base, and if so, whether Davis can nonetheless perform jobs that exist in the national economy. *Woody v. Barnhart*, 326 F. Supp. 2d 744, 753 (W.D. Va. 2004); *see also Campbell v. Barnhart*, No. 5:05-cv-87, 2006 WL 1399343, at *3 (W.D. Va. May 17, 2006).

## IV. Conclusion

I find that the Commissioner's final decision is not supported by substantial evidence in the record. The ALJ's finding that Davis can perform "simple and unskilled work" does not adequately reflect his own findings and other credited evidence about the effects of Davis's

mental impairment and the limitations they impose on his ability to perform basic work-related tasks on a sustained basis. I also find that substantial evidence does not support the ALJ's reliance on the grids because he did not account for Davis's specific cognitive limitations and the effect of these limitations on the unskilled light occupational base. Therefore, I **RECOMMEND** that this Court **GRANT** Davis's Motion for Summary Judgment (ECF No. 12), **DENY** the Commissioner's Motion for Summary Judgment (ECF No. 17), **REVERSE** the Commissioner's final decision, and **REMAND** this case for further proceedings under the fourth sentence of 42 U.S.C. § 405(g). If the Commissioner cannot meet her burden with evidence in the existing record, she should conduct a supplemental administrative hearing at which both parties will be allowed to present additional evidence and argument.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Jackson L. Kiser, Senior United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: July 14, 2014.

Joel C. Hoppe
United States Magistrate Judge